UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| 7-Eleven, Inc.,<br>    Plaintiff,<br><br>       v.<br><br>Natasha Khan et al.,<br>    Defendants. | No. 3:15-cv-01011 (JAM) |

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

This case principally concerns a dispute about who owns certain gasoline equipment at a former 7-Eleven gas station and convenience store in Unionville, Connecticut. Plaintiff 7-Eleven formerly leased the property from defendant Warren Shuck and entered into a franchise agreement with defendant 32528 Unionville, Inc. (Unionville). Defendant Natasha Khan was the president of Unionville, and her brother Jahangir (Jahan) Khan was the day-to-day manager of the Unionville store.

About a year ago, 7-Eleven decided not to renew its lease with Shuck and to terminate its franchise agreement with Unionville. As the parties neared the end of their contractual relationship, 7-Eleven agreed to sell certain on-site equipment to Unionville. Unfortunately, however, the parties failed to specify precisely in writing what equipment was being bought and sold, and this litigation has ensued.

The parties now dispute whether 7-Eleven agreed to sell Unionville the underground gasoline storage tanks, the gasoline dispensers, and accompanying gasoline-related piping and equipment (hereinafter collectively referred to as "the gasoline equipment") that was at the store location. For its part, 7-Eleven insists that it did not agree to sell the equipment and seeks this Court's intervention to access the property and remove its gasoline equipment. By contrast,

1

defendants Unionville and Natasha Khan contend that 7-Eleven agreed to sell them this equipment. Meanwhile, defendant Shuck—the property's land owner—does not take a position with respect to whether a sale took place; he has nonetheless declined to grant 7-Eleven access to the property to remove the gasoline equipment absent proof to his satisfaction that 7-Eleven continues to own the gasoline equipment.

7-Eleven has brought this action against Unionville, Natasha Khan, and Shuck alleging claims against one or more of them for breach of contract, for breach of the covenant of good faith and fair dealing, for violation of the Connecticut Unfair Trade Practices Act, and for common law conversion. Doc. #1. 7-Eleven has also moved for a temporary restraining order to prevent Unionville from using the gasoline equipment and for a preliminary injunction to permit it access to the property in order to remove the gasoline equipment. Doc. #2. I have previously entered orders to require drainage of the gasoline tanks and to prohibit defendants' use of the gasoline equipment pending an evidentiary hearing and resolution of 7-Eleven's motion for injunctive relief. Doc. #24, #36.

Following an extended evidentiary hearing, I conclude that 7-Eleven has not established its right to preliminary injunctive relief. Although I conclude that 7-Eleven has demonstrated a high likelihood of success on at least the merits of its claim for common law conversion, I cannot conclude that 7-Eleven has established irreparable harm to allow immediate access to the property to remove the gasoline equipment. I am also prepared to permit defendants to resume gasoline operations at the property pending the trial of this case, provided that defendants are able to satisfy stringent certification and monitoring requirements as described at the end of this Order.

## BACKGROUND

The following facts are based on the testimony and evidence introduced during the course of three days of evidentiary hearings on 7-Eleven's motion for a preliminary injunction.[1] Since at least 2002, 7-Eleven leased property from Warren Shuck for a convenience store and gas station location in Unionville, Connecticut. Although 7-Eleven leased the land from Shuck, there is no dispute that 7-Eleven had previously acquired and owned the gasoline equipment on the Unionville property prior to the events that give rise to this lawsuit.[2]

On December 19, 2013, 7-Eleven entered into a franchise agreement with Unionville to operate the store and gasoline operation. Exh. #6. By late 2014, however, 7-Eleven had decided that the Unionville operation was not profitable enough to retain as one of its franchise locations, and 7-Eleven decided not to renew its lease with Shuck when it expired on June 27, 2015, and also to terminate its franchise agreement with Unionville. Exhs. #14-#15.

7-Eleven formally advised Natasha Khan on January 16, 2015, that it was terminating the franchise agreement and intended to take possession of the property not later than June 15, 2015, "to enable 7-Eleven to remove all Equipment, signage, and other property of 7-Eleven prior to the expiration of the lease." Exh. #16. Extended communications followed over the next several months, principally between Natasha and Jahan Khan and their two points of personal contact at

---

[1] Plaintiff 7-Eleven called the following witnesses during the evidentiary hearing: Edwin Colgan, Sterling Osborn, Brian Serrecchia, Marguerite Brindock, Richard Hall, and Warren Shuck. Defendants Unionville and Natasha Khan called the following witnesses: Jahan Khan and Natasha Khan.  Although defendant Shuck was called as a witness by 7-Eleven, he did not call any witnesses at the hearing or ask any questions of witnesses called by others. Shuck has not hired counsel to represent his interests, and he was present only intermittently at the hearings (despite being advised by the Court of his right to fully participate as a party).

[2] Defendants Unionville and Khan argue in a late-filed brief that defendant Shuck may actually own the tanks. Doc. #70 at 2. I reject this argument, because the parties entered the following stipulation at the beginning of the hearing: "Plaintiff 7-Eleven and defendants Natasha Khan and 32528 Unionville, Inc., hereby jointly stipulat[e] that for purposes of the instant litigation, 7-Eleven Inc.'s ownership of the underground storage tanks (USTs) located at 70 South Main Street, Unionville, Connecticut, prior to 7-Eleven and Unionville's execution of the termination and settlement agreement dated June 10, 2015, is not in dispute." Doc. #59 at 6.

7-Eleven: Edwin Colgan, a regional marketing manager for 7-Eleven, and Sterling Osborn, a 7-Eleven field consultant. The Khans declined 7-Eleven's offer to transfer to another franchise location, and they stated their interest in entering their own property lease with Shuck and continuing to run the store as an independent operation at the Unionville location.

In the meantime, another 7-Eleven official—Marguerite Brindock, a transaction specialist—contacted Shuck to advise that 7-Eleven did not intend to renew its lease for the Unionville location when it expired on June 27. Brindock also told Shuck that 7-Eleven intended to remove its gasoline tanks from the property, and Shuck testified that he agreed at that time to the tank removal. Doc. #60 at 145.

According to Colgan, he spoke to the Khans in about March 2015 about their potential purchase of existing 7-Eleven equipment inside the store, such as counters, refrigerators, Slurpee machines, and display gondolas. Doc. #59 at 37-38, 85, 96-98. On April 20, Colgan emailed Brindock to say that Unionville was asking him about the price that 7-Eleven would be looking for to sell equipment; on the basis of 7-Eleven's records concerning what equipment was in the store, Brindock responded that the equipment had a book value of approximately $20,000. Exh. #19; Doc. #59 at 219-222. About one month later, Colgan reiterated in an email to Brindock that he intended to sell certain store equipment for $20,000. Although his email does not make clear what equipment would be sold, the context of his email makes clear that he did not contemplate the sale of equipment to include the gasoline equipment, because he further noted that "the gas department has to pull the tanks before our leaving." Exh. #27; Doc. #59 at 42-43.

Despite 7-Eleven's intention to remove the gasoline equipment, the Khans asked 7-Eleven to let them keep the equipment so that they could continue to sell gas at the store location. Colgan appeared to be initially receptive to the request and said that he would inquire

about this possibility with 7-Eleven's corporate officials. Doc. #59 at 38-39. But later email exchanges show that other 7-Eleven officials, including Brindock and Richard Hall—the company's northeast environmental compliance manager—promptly advised Colgan that 7-Eleven should decline to sell the gas equipment. In particular, on May 8, Hall emailed Colgan and Osborn to state that the underground gasoline storage tanks were very near the end of their useful life and that environmental liability concerns would not allow for the tanks to remain in the ground under the control of a new owner:

> If we were staying we would let the tanks ride for a couple more years, before pulling or replacing. But since we are leaving, we would not let someone else operate with the existing tanks, too much liability involved. So we will pull the tanks and lines etc., and they will have a nice clean site to start out with if they have someone who will install new ones for them. We would pull the tanks before the lease expires, because we have no right to be there afterwards.

Exh. #23.[3] Colgan and Osborn credibly testified that they personally and repeatedly advised the Khans following this email exchange that the tanks would have to be removed. Doc. #59 at 46-47, 54, 138-39.

Still, Jahan Khan resisted. On May 7, Brian Serrecchia, a 7-Eleven contractor, went to the Unionville site to conduct site preparation tests in anticipation of later removing the gasoline tanks from the ground. But Jahan Khan became angry and demanded that Serrechia leave the property before he could complete the tests. Exh. #22. About a week later, Osborn convinced Jahan Khan to allow Serrechia to do his survey work for the tank removal. Exh. #26. Serrechia soon returned to conduct further testing without resistance. Doc. #59 at 150-51.

Separately, 7-Eleven informed the Connecticut Department of Energy and Environmental Protection ("DEEP") on May 22 that it intended to remove the tanks during the last week of

---

[3] Hall testified concerning 7-Eleven's use of third-party contractors to monitor the safety and integrity of gasoline operations at the Unionville location while it was a 7-Eleven franchise and that he was not aware of any environmental accidents occurring at the Unionville site. Doc. #60 at 318-19.

June. Exh. #31. Through May and early June, emails among 7-Eleven personnel show continued and extensive planning by 7-Eleven for the removal of the gasoline equipment, and these emails also show that both Colgan and Osborn discussed very specific details with the Khans about the logistics of the gasoline equipment removal and how to minimize disruption from the removal to the Khans' convenience store operation.[4] Both Colgan and Osborn credibly testified concerning these events. Doc. #59 at 100, 110, 139-48.

On June 2, Brindock emailed others at 7-Eleven to advise that she had just spoken with Shuck who "confirmed that 7-Eleven bought all equipment, including the USTs [underground storage tanks], from him several years ago so he has no issue with our planned tank pull." Exh. #30; Exh. #62 (¶7); Doc. #60 at 146. Three days later, however, Shuck contacted Brindock to ask if he could buy the piping to the gasoline dispensers. 7-Eleven promptly refused this request. One 7-Eleven environmental official (Jose Rios) wrote to Brindock to advise that "[t]he fuel assets were installed in 1987 so they're essentially 28 years old and near end of life. I wouldn't recommend selling him assets." Exh. #39.

Brindock advised Shuck in turn that 7-Eleven would not sell this equipment. Doc. #60 at 13-15. Consistent with this refusal of 7-Eleven to sell him any of the gasoline equipment, Shuck himself co-signed an Inland Wetlands Commission application on June 9 that was filed by 7-

---

[4] *See, e.g.,* Exh. #26 (Osborn email of May 21 reflecting that "I spoke with the franchisee today" and franchisee had questions about "[h]ow long will the tank pull take once the process begins" and "[w]ill the island w[h]ere the gas pumps currently are be removed and brought down to a flat surface," and "will the lights on the island be removed" and "can we leave the gas price sign in tack [sic]" and "[d]o we have a guess when the tank pull will begin"); Exh. #30 (email chain among several 7-Eleven officials from mid-May to early June discussing need to apply for wetlands permit to remove tank and to have landlord sign access agreement for tank removal in the event that the lease expired before tanks could be removed); Exh. #31 (7-Eleven email of May 22 to engineer at the Connecticut Department of Energy and Environmental Protection stating that "7-Eleven, Inc. would like to schedule the removal of three (3) underground storage tanks" at the Unionville location for the week of June 22); Exh. #32 (Osborn email of June 3 reflecting that "I spoke with the franchisee today" and that "[s]he is okay with moving the dumpster wherever as long as it does not block what little parking lot they will have during the tank removal"); Exh. #37 (Osborn email of June 5 advising tank removal contractor that franchisee "won't be putting in tanks for sometime so they have requested [the tank removal area] be paved over as usual" instead of covered with pea stone gravel).

Eleven and that sought approval of 7-Eleven's request to "remove its underground storage tanks and associated system, including dispensers and piping." Exh. #38.

As 7-Eleven continued its plans to remove the tanks, Osborn text-messaged Natasha Khan on June 5 to remind her that "someone will be out doing some more prep work for the tank pull today at 8:30am," to which she responded "Ok," and then she subsequently furnished her email address for 7-Eleven to transmit to her a copy of the termination-of-franchise agreement. Exh. #34. Osborn credibly testified that following this text message exchange, Natasha did not have any questions about the process and did not give any indication that she thought the tanks would remain on site. Doc. #59 at 152. Although Natasha Khan testified at the hearing that she did not read this text message before responding "Ok," her testimony on this issue was not credible.

Brian Serrechia then returned on June 5 to the Unionville location to take some test borings of soil quality for potential gasoline contamination. Jahan Khan asked Serrechia if 7-Eleven would allow him to keep the gasoline dispensers, and Serrechia replied that Khan should talk to 7-Eleven about this issue. Doc. #59 at 183. Jahan Khan also told Serrechia that he wanted the area where the tanks were removed from to be covered with pavement rather than with gravel, because he was not sure that replacement tanks would be put in right away. *Ibid.* Serrechia testified that he was not aware of any contamination concerns from the limited soil testing that he did on June 5. Doc. #59 at 194-95.

On June 10, 7-Eleven, Unionville, and Natasha Khan signed a document titled Termination and Settlement Agreement (the "Termination Agreement"), *see* Exh. #9, which contemplated the end of the franchise agreement between the parties. Once again, the Khans

asked Osborn if 7-Eleven would leave the tanks in the ground for them, and Osborn "explained again, as I had in the past, that we couldn't leave the tanks in the ground." Doc. #59 at 155.

In the Termination Agreement, Unionville agreed to purchase certain property from 7-Eleven for $20,000, and the parties also signed another agreement—General Assignment and Bill of Sale—to the same effect. Exh. #12. The parties, however, failed to specify in writing precisely what equipment was being sold. An exhibit to their agreements that was titled "Purchased Equipment" should have memorialized the items to be sold, but the parties left the exhibit entirely blank. Exh. #11.

When asked why 7-Eleven had not filled out the exhibit to describe what equipment was being purchased, Colgan testified that it was "[j]ust negligence on my part" and that "[w]e had talked very specifically about the equipment in the store and I just didn't include it." Doc. #59 at 59. In any event, apart from their current disagreement about whether gasoline equipment was part of the agreed sale transaction, the parties do not dispute that 7-Eleven agreed to sell certain non-proprietary equipment that was in the convenience store, but that 7-Eleven did *not* agree to sell any proprietary equipment that bore 7-Eleven's brand or logo. *Id.* at 60-61.

Two days after the parties signed the Termination Agreement, Shuck told Brindock on June 12 that his "new tenant [Jahan Khan] informed him that he has struck a deal to buy the tanks, underground lines and dispensers." Exh. #41; Doc. #60 at 150-51. Surprised by this news, Brindock relayed it to others at 7-Eleven, and Colgan promptly wrote back to state that there had been no deal to sell the gasoline equipment:

> I have no idea where the Fz [franchisee] is getting this. We have at every step since we were notified of the need for the tanks to be pulled told them the tanks will be pulled. We have shared it all with them every step. The FZ knows he cannot buy the tanks.

Exh. #41. Brindock then called Shuck and responded to Colgan as follows: "Spoke to the LL [landlord] again. He understands (that they are confused?). anyway, he is signing the lease termination and access agreement and sending via fax on Monday." Exh. #42.

Yet Shuck never signed the access agreement as requested by Brindock. Exh. #62 (¶¶ 9-15). He testified at the hearing before the Court that he did not do so because he was uncertain whether 7-Eleven had sold the gasoline equipment to Unionville; he said he would sign an access agreement if he had proof that 7-Eleven owned the gasoline equipment. Doc. #60 at 151-52.

The parties had decided on June 15 as the day for the formal turnover of the store from 7-Eleven to Unionville. On that morning, Colgan, Osborn, and other 7-Eleven personnel and contractors arrived at the site to remove 7-Eleven's store property and also the gasoline dispenser equipment (but not yet the underground storage tanks). Osborn was concerned when he overheard Jahan Khan making arrangements by telephone to obtain a new gas delivery, and he sent the 7-Eleven environmental compliance manager (Richard Hall) an "urgent" email to report that "this will make the tank pull difficult because it won't be our gas in the tanks" and inquiring if "there [is] a way to lock the tank covers so gas can't be delivered at all?" Exh. #45; Doc. #59 at 160.

Jahan Khan balked at the removal of the gasoline dispensers, and 7-Eleven personnel left the dispensers but removed all signage from the premises and padlocked the so-called "fill" covers for the gas tanks in hopes that they could not be used until the tanks were later removed. Soon after leaving the store, Colgan wrote the following warning email to Brindock, Osborn, Hall, and others at 7-Eleven about what Jahan Kahn might do next:

> I left you a voice message earlier concerning this store. The former Fz [franchisee] still believes he has some right to these tanks. I have explained all along that the tanks, pumps and everything to do with the gas is ours. I explained that tanks would be pulled since I was notified due to possible liability. I believe he is just giving conflicting information in

some hope that he can win on this. He is a very hostile person and does not make logical decisions. We had the product removed from the tanks painted over the PDU's and had locks put on the fill covers. I was in the store with one of my FC's [field consultants] and the situation turned hostile. I called Michael [a lawyer at 7-Eleven's legal department] and with some advice from him we finished the other elements needed for example store inventory, removal of RIS and signature for the claims release. I am confident he will do what he can to impede our removal of these tanks….

Exh. #46.

Colgan's warning proved to be right. Two days later, on June 17, Osborn, Colgan, Serrecchia, and a contractor returned to find that the tank padlocks had been removed, that the tanks had been refilled with gasoline, and that gasoline was being sold again (all without requisite approvals from the State of Connecticut). Jahan Khan became highly threatening and ordered the 7-Eleven team to leave the premises. Exhs. #51, #53; Doc. #59 at 163-64, 184-85.

That evening, the Inland Wetlands Commission approved 7-Eleven's tank removal application request. At that meeting, the Khans appeared and told a 7-Eleven representative (Luis Ferriera) that "they own the whole UST system and bought it from 7-Eleven when they had signed their contract." Exh. #51.

Both Jahan and Natasha Khan testified before the Court. They testified in substance that they believed that 7-Eleven was going to sell the gasoline equipment. Beyond stating that Colgan was initially receptive to their proposal and stating their hope that 7-Eleven would sell the gasoline equipment, they were unable to identify a specific conversation or writing to substantiate their claim that 7-Eleven agreed to sell the gasoline equipment. According to the Court's notes of his (yet untranscribed) testimony on October 30, Jahan Khan testified that it was his "understanding" that the tanks were "included" in the sale of equipment but that "I don't really remember a clear conversation." Similarly, Natasha Khan testified that she knew that Colgan was going to check with 7-Eleven corporate officials about selling the gasoline

equipment but that Colgan did not get back to her with a response and that Colgan had told her in May that the tanks might have to come out.

## DISCUSSION

The Second Circuit has recently made clear that "[a] preliminary injunction is an equitable remedy and an act of discretion by the court." *Am. Civil Liberties Union v. Clapper*, ___ F.3d ___, 2015 WL 6516757, at *5 (2d Cir. Oct. 29, 2015). The Court's exercise of discretion, however, is limited by well-established criteria that require a party to make certain threshold showings in order to qualify for preliminary injunctive relief. "A party seeking a preliminary injunction must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *Id.* (citing *Winter v. NRDC*, 555 U.S. 7, 20 (2008)); *see also Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010). Here, I consider just the first two factors (likelihood of success and irreparable harm), and there is no need for me to consider the last two factors (balance of equities and public interest).

### *Likelihood of Success on the Merits*

7-Eleven's likelihood of success essentially turns on one issue: whether it can show that it did *not* agree to sell the gasoline equipment to Unionville. I conclude that 7-Eleven has amply established that it did not agree to sell the gasoline equipment, and therefore that it has a high likelihood of success at least as to its claim of unlawful conversion. *See, e.g., Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 418 (2007) ("Conversion is an unauthorized

11

assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights.").

I credit the testimony of 7-Eleven's witnesses that 7-Eleven did not agree to Unionville's request to sell its gasoline equipment. The 7-Eleven witnesses' accounts are extensively corroborated by company documents demonstrating 7-Eleven's consistent position that the gasoline equipment should not be sold but instead should be removed from the Unionville property in order to minimize 7-Eleven's exposure to future tort liability. Moreover, 7-Eleven's contemporaneous conduct to arrange removal of the gasoline equipment was fully consistent with its stated desire not to sell the gasoline equipment. It hired third-party contractors to scope the site for tank removal. It notified DEEP of its intent to remove the tanks. It applied for permission from the Inland Wetlands Commission to remove the tanks. And it removed the gasoline and padlocked the fill-line access to the tanks upon termination of the franchise agreement on June 15.

To be sure, 7-Eleven was careless when it failed to specify in writing what equipment was being sold to Unionville in the Termination Agreement that it drafted and furnished on June 10 for the parties to sign. But the lack of *written* specification that 7-Eleven would not sell its gasoline equipment is not tantamount to a meeting of the minds that the gasoline equipment would therefore be sold. Under Connecticut law, "[i]t is well settled that the party seeking to establish the existence of an enforceable contract bears the burden of proving a meeting of the minds between the parties." *LeBlanc v. New England Raceway, LLC*, 116 Conn. App. 267, 271 (2009). Thus, "[i]n order for an enforceable contract to exist, the court must find that the parties' minds had truly met," and "[i]f there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, [then] no contract has

been entered into by them and the court will not make for them a contract which they themselves did not make." *Milford Bank v. Phoenix Contracting Group, Inc.*, 143 Conn. App. 519, 527-28 (2013) (Robinson, J.) (internal citation and quotations marks omitted). These axiomatic principles of contract formation apply with equal force to whether the parties agreed to particular terms of an otherwise enforceable contract.[5]

Nor would it matter if I were to conclude that any ambiguity in the Termination Agreement must be construed against 7-Eleven as its drafter. That is because "[t]he concept of a meeting of the minds goes not to ambiguity, but to the very existence of the contract." *Proteus Books Ltd. v. Cherry Lane Music Co., Inc.*, 873 F.2d 502, 508 (2d Cir. 1989). And here there was no meeting of the minds in the absence of any written agreement to sell the gasoline equipment and in light of the extensive evidence that 7-Eleven declined the Khans' oral requests to sell the gasoline equipment.

In short, because 7-Eleven has convincingly shown, on what appears to be a very well established factual record, that it did not agree to sell its gasoline equipment, 7-Eleven has established a high likelihood of success on at least its claim of unlawful conversion. There is no need at this time for me to consider the effect of the release that was signed on June 15 by 7-Eleven and by Unionville and Natasha Khan, because defendant Shuck was not a party to the release agreement. Accordingly, even if the release forecloses 7-Eleven's claims against Unionville and Natasha Khan, it does not affect 7-Eleven's claims against Shuck and the availability of injunctive relief against Shuck. As the property's owner where the gasoline equipment is installed and buried, Shuck has authority—whether by consent or by Court order—

---

[5] Defendants Unionville and Khan raise a host of other arguments in a brief filed after the first two days of testimony, in response to the Court's request for further briefing on two limited issues (the effect of the release and the question of irreparable harm). *See* Doc. #64. I decline to consider these arguments, because they were not timely raised and do not have obvious merit based on my review of the evidence to date.

to allow 7-Eleven access to the property to remove the equipment if it belongs to 7-Eleven (and notwithstanding any objection by a tenant who does not have a rightful claim to the equipment).

### *Irreparable Harm*

I turn next to whether 7-Eleven has demonstrated irreparable harm. As the Second Circuit has made clear, "[a] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir. 2009). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enterprise Six Nations Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks and citations omitted). Correlatively, the Second Circuit has long held that "irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages is adequate compensation a preliminary injunction will not issue." *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).

7-Eleven argues that it will suffer irreparable harm absent an injunction because it remains liable for any environmental damages that may occur while the gasoline equipment remains out of 7-Eleven's control. But this is a claim in the nature of monetary injury, not irreparable injury. Moreover, 7-Eleven has fallen well short of showing that any injury is imminent (at least in the absence of any indication that any future gasoline sales activity will not be subject to appropriate professional monitoring as provided below). According to Richard Hall—7-Eleven's environmental compliance manager—the gasoline tanks have two more years of life expectancy, and 7-Eleven would have been prepared to allow the equipment to remain in

the ground if a 7-Eleven franchisee had continued to operate the property. Exh. #23 ("If we were staying we would let the tanks ride for a couple more years, before pulling or replacing. But since we are leaving, we would not let someone else operate with the existing tanks, too much liability involved.").

Nor has there been any showing that the tanks are leaking, that there is already contamination, or that the Khans have engaged in unsafe gasoline practices for the many years that their family has operated a gas station at the premises. True enough, the Khans did begin selling gasoline in June 2015 without obtaining requisite permits and insurance from the State of Connecticut, but these alleged deficiencies have now been redressed. Doc. #37, Attachments 1-10. I also conclude that 7-Eleven's claim that it or its employees will be subject to future enforcement action by the DEEP is speculative, especially in the context of 7-Eleven's ability to show any inquiring regulators that it has responsibly litigated this action to seek the recovery and removal of its property and to minimize its potential liability.

7-Eleven cites a Magistrate Judge's ruling in the District of Puerto Rico for the proposition that unauthorized operation of underground storage tanks constitutes irreparable harm. *See Total Petroleum Puerto Rico Corp. v. Colon-Colon*, 577 F. Supp. 2d 537 (D.P.R. 2008). But the defendants in that case had also continued to use the plaintiff's real and intellectual property, occupying land that belonged to the plaintiff and displaying its trademark. An "unauthorized interference with a real property interest constitutes irreparable harm as a matter of law." *Gulf Oil Ltd. Partnership v. Smerci*, 2013 WL 394893, at *5 (E.D.N.Y. 2013). Further, unauthorized use of trademarks is considered irreparable harm to goodwill. *See id.* at *6. Neither of those conditions is present in this case, and I remain unpersuaded that 7-Eleven will suffer irreparable harm during the pendency of this litigation.

## CONCLUSION

7-Eleven has demonstrated a strong likelihood of success on the merits, but it has not shown that it will suffer irreparable harm absent a preliminary injunction to remove the gasoline equipment. Accordingly, 7-Eleven's motion for a preliminary injunction (Doc. #2) to obtain access to the property and to remove the gasoline equipment is DENIED.

The Court's temporary restraining order that prevents Unionville from accessing the gasoline equipment or selling gasoline (Docs. #24, #36) shall continue in full force and effect contingent upon defendants' filing of a motion for relief from the temporary restraining order within 10 days of this order. Such motion shall contain a certification personally signed by each of the three defendants in this action that they wish to resume and allow gasoline sales activity at the Unionville property, that they are in compliance with all federal and state safety and environmental laws that would permit them to engage in gasoline sales activity, and that they have retained the services of a qualified independent third-party contractor to monitor any ongoing gas station operations in the same manner that Unionville was subject to monitoring by 7-Eleven contractors during the course of the franchise agreement between 7-Eleven and Unionville. The certification shall describe the qualifications of the third-party monitor, shall describe the specific monitoring activities that will be undertaken by the monitor, and shall covenant that the third-party monitor will disclose all reports of its monitoring activities immediately and directly to 7-Eleven (or its designated representative).

7-Eleven may file any objection to defendants' motion within 7 days of its filing. If there is no objection, then the Court intends to lift its restraining order. If an objection is filed, the Court will convene a hearing or teleconference to address the objection.

The parties shall promptly contact chambers for the setting of a teleconference at which the Court will discuss the entry of a scheduling order for any remaining discovery and for setting a prompt trial date to occur within the next several months.

Lastly, this Order is without prejudice to the right of defendant Shuck to decide whether he wishes his property to be used for gasoline operations in light of any liability concerns or whether he wishes to grant access to his property to allow 7-Eleven to remove the gasoline equipment in light of the Court's conclusion that 7-Eleven has demonstrated a high likelihood of success. The Court strongly recommends that Shuck retain the assistance of counsel to protect his legal rights and the possibility of liability that may arise from further litigation of the full range of claims in this matter. If Shuck is unable to afford counsel, he should promptly contact the Court to ascertain if he may qualify for the appointment of *pro bono* counsel.

It is so ordered.

Dated at New Haven this 16th day of November 2015.

/s/ ***Jeffrey Alker Meyer***
Jeffrey Alker Meyer
United States District Judge